[No. D051556. Fourth Dist., Div. One. Dec. 2, 2008.]

GREYSTONE HOMES, INC., Plaintiff and Appellant, v.
MIDTEC, INC., Defendant and Respondent.

## COUNSEL

Payne & Fears, Thomas L. Vincent and Erik M. Anderson for Plaintiff and Appellant.

Cooper, White & Cooper and Kathleen F. Carpenter for California Building Industry Association as Amicus Curiae on behalf of Plaintiff and Appellant.

Lewis Brisbois Bisgaard & Smith, Peter L. Garchie, Lisa W. Cooney and Shauna L. Hagan for Defendant and Respondent.

**OPINION**

**AARON, J.—**

## I.

## INTRODUCTION

In *Aas v. Superior Court* (2000) 24 Cal.4th 627, 636 [101 Cal.Rptr.2d 718, 12 P.3d 1125] (*Aas*), the California Supreme Court concluded that a group of homeowners could not recover damages in negligence from the developer, contractor or subcontractors who built their homes, for existing construction defects that had not yet caused either property damage or personal injury. In reaching this conclusion, the *Aas* court explained that while "tort law provides a remedy for construction defects that cause property damage or personal injury" (*id.* at p. 635), the "economic loss rule" precludes recovery for damages such as "the difference between price paid and value received, and deviations from standards of quality that have not resulted in property damage or personal injury" (*id.* at p. 636).

In response to the holding in *Aas*, the Legislature enacted Civil Code[1] section 895 et seq. (the Right to Repair Act or the Act). The Act establishes a set of building standards pertaining to new residential construction, and provides homeowners with a cause of action against, among others, builders and individual product manufacturers for violation of the standards (§§ 896, 936). The Act makes clear that upon a showing of violation of an applicable standard, a homeowner may recover economic losses from a builder without having to show that the violation caused property damage or personal injury (§§ 896, 942). In such an instance, the Act abrogates the economic loss rule, thus legislatively superseding *Aas*.

Greystone Homes, Inc. (Greystone), a homebuilder, brought this action against Midtec, Inc. (Midtec), among others. In its complaint, Greystone alleged that various homeowners had made claims against Greystone for damage caused by plumbing fittings that Midtec manufactured, and that the fittings were defective within the meaning of the Act. Greystone claimed that it had incurred costs to replace the defective fittings, and alleged claims including negligence and equitable indemnity causes of action against Midtec.

Midtec brought a motion for summary judgment and/or summary adjudication in which it claimed that Greystone could not recover for purely

---

[1] Unless otherwise specified, all subsequent statutory references are to the Civil Code.

economic losses that it incurred in replacing the fittings. In opposition, Greystone claimed that the Right to Repair Act abolished the economic loss rule under the circumstances of this case, and argued that both builders and individual product manufacturers are liable under the Act for the costs of repairing construction defects. In reply, Midtec contended that the Act did not apply to Greystone's action, and that the economic loss rule precluded Greystone from prevailing against Midtec on its claims.

The trial court granted Midtec's motion for summary judgment. The court acknowledged that the Act provides an exception to the economic loss rule for actions brought under the Act by homeowners. However, the court concluded that Greystone is not entitled to pursue the statutorily created cause of action because Greystone is not a homeowner. The court ruled that the economic loss rule bars Greystone from recovering against Midtec on Greystone's common law claims.

Greystone's appeal raises two questions of first impression concerning the Right to Repair Act. The first question is whether a builder may recover for economic losses caused by a product manufacturer's violations of the Act's standards through an equitable indemnity claim against the manufacturer. The second question is whether a builder may recover its economic losses from an individual product manufacturer through a direct negligence claim based on the product manufacturer's violation of the Act's standards. We conclude that a builder may recover from a product manufacturer for economic losses caused by the manufacturer's violation of the standards set forth in the Act through an equitable indemnity action, but that a builder may not recover for these losses through a direct negligence claim against the manufacturer. We therefore reverse the trial court's summary judgment and remand the matter to the trial court with directions to consider Midtec's alternative motion for summary adjudication.

## II.

## FACTUAL AND PROCEDURAL BACKGROUND[2]

A. *Factual background*

In late 2000 or early 2001, Radiant Technologies, Inc. (RTI), purchased plastic plumbing fittings from Midtec. RTI used the fittings as a component part in its Plumb-Pex plumbing system. RTI distributed the Plumb-Pex system to plumbing wholesalers, who in turn sold the system to plumbing subcontractors.

---

[2] We base our factual background primarily on the facts the parties set forth in their separate statements of facts filed in the trial court, and the evidence cited therein. (See *Coburn v. Sievert* (2005) 133 Cal.App.4th 1483, 1489 [35 Cal.Rptr.3d 596].)

Greystone is a merchant homebuilder. Beginning in approximately 2003, Greystone developed and built a new home community in Chula Vista known as Willow Bend. Willow Bend is composed of 110 condominiums/town-houses, clustered in 17 buildings. Greystone's plumbing subcontractor, Production Plus Plumbing, installed the RTI Plumb-Pex system, which contains Midtec fittings, in 66 of the Willow Bend units, between 2003 and 2005.

The owners of some of the units that contained the Midtec fittings began to complain to Greystone about leaks in their plumbing systems. Twenty-two of the units experienced failures of Midtec fittings. In some instances, there were multiple failures in a single unit. The Midtec fittings failed primarily due to fatigue caused by a molding defect in the manufacturing process. Fittings continued to fail during Greystone's investigation of the homeowners' complaints. Water leaks associated with the fitting failures presented a health risk to homeowners.

There were a total of approximately 1,980 Midtec fittings in the 66 homes. Greystone determined that if it did not replace the Midtec fittings, it was highly probable that there would be additional failures. Greystone replaced all of the Midtec fittings, including those that had not yet actually failed. The total cost to replace all of the fittings was approximately $1,494,904.04. The cost for repairs related to fittings that had failed was approximately $106,000.

While Midtec had a contractual relationship with RTI, it did not have a contractual relationship with Greystone. Midtec did not provide a warranty to RTI for the fittings. The only warranty that was provided to either Greystone or to homeowners in the Willow Bend project that related to plumbing was RTI's warranty for the Plumb-Pex system.

Greystone sued RTI and Midtec. Greystone reached a settlement with RTI. As part of the settlement, RTI paid Greystone $460,000—an amount that exceeds Greystone's costs to repair water damage caused by fittings that actually failed.

B. *Procedural background*

In May 2005, Greystone filed a complaint against RTI, RTI's insurance company, Zurich American Insurance Company (Zurich), and Midtec. As to Midtec, Greystone brought a claim for negligence, a separate claim for indemnity and contribution, and requested declaratory relief. Greystone subsequently reached a settlement with RTI. In February 2007, the trial court found that Greystone and RTI had entered into the settlement in good faith.

The court subsequently dismissed Greystone's complaint as to RTI and Zurich.

In April 2007, Midtec filed a motion for summary judgment or, in the alternative, for summary adjudication. In its motion, Midtec noted that pursuant to the economic loss rule, a plaintiff may not recover, in tort, economic losses caused by an allegedly defective product when those losses are unrelated to either property damage or bodily injury. Midtec argued that Greystone had already recovered all of its damages that were related to property damage caused by the allegedly defective fittings, through its settlement with RTI, and maintained that the economic loss rule precluded Greystone from recovering additional damages from Midtec related to the cost of replacing fittings that had not failed or caused property damage.

Greystone opposed the motion. In its opposition, Greystone argued that the Right to Repair Act had entirely abrogated the economic loss rule in construction defect litigation. Specifically, Greystone argued that the Act imposed "cost-of-repair liability upon builders and individual product manufacturers whose products are defective, even in the absence of any specific property damage or bodily injury." Greystone claimed that Midtec was thus liable to Greystone for Greystone's costs to replace all of the fittings, including those that had not yet caused property damage. Greystone noted that its total cost to repair all of the fittings was approximately $1.5 million, which far exceeds the $460,000 it received in its settlement with RTI.

In its reply to Greystone's opposition, Midtec argued that the Right to Repair Act is "completely inapplicable to the circumstances of this case." Midtec maintained that only homeowners are authorized to bring an action pursuant to the Act.[3] Midtec also noted that section 936 provides in part, "Nothing in this title modifies the law pertaining to joint and several liability for builders, general contractors, subcontractors, material suppliers, individual product manufacturer[s], and design professionals that contribute to any specific violation of this title." Based on this language, Midtec argued that "[s]ection 936 alone is dispositive of the issue that [s]ections 895 et seq. do not apply to this action between the developer and a component part manufacturer."

In July 2007, the trial court held a hearing on Midtec's motion for summary judgment or summary adjudication. After oral argument, the trial court granted Midtec's motion for summary judgment. In granting the motion, the court reasoned in part: "[Midtec] has met its initial burden of

---

[3] Midtec noted that section 895, subdivision (f) provides in part: " 'Claimant' or 'home-owner' includes the individual owners of single-family homes, [and] individual unit owners of attached dwellings . . . ."

demonstrating each of the claims asserted by [Greystone] seeks to recover the economic losses associated with replacing defective plumbing fittings that had not yet failed, i.e. had not yet caused property damage. Per Separate Statement [of Facts] number 22, it is undisputed that the $460,000 settlement with [RTI] exceeds the cost of repairing the fittings that actually leaked prior to replacement. Therefore [Midtec] has met its burden of demonstrating that the economic loss rule bars any further recovery by [Greystone], and the burden shifts to [Greystone]. [Greystone's] only contention refuting defendant's position is that the enactment of Senate Bill 800[4] abolishes the economic loss rule. This contention lacks merit. Rather than abolish the economic loss rule completely, S.B. 800 created an exception to the rule where a homeowner or [homeowners] association brings a claim to recover damages for enumerated construction defects. [(See §§ 895, subd. (f), 896, 942.)] Arguably, the defective fittings fall within the enumerated construction defects. [(See § 896, subd. (a)(14), (15).)] However, [Greystone] is not a homeowner or [homeowners association], and as a result is not entitled to pursue the statutorily created cause of action. [Greystone's] only recourse is a common law claim, and the economic loss rule applies to bar such common law claims. In addition, [Greystone] provides no evidence demonstrating its compliance with the procedural prerequisites of S.B. 800, i.e. a pre-lawsuit notice and opportunity to repair. [(§§ 910, 917, 930, subd. (b).)]"

The trial court subsequently entered judgment in favor of Midtec. Greystone timely appeals.

## III.

## DISCUSSION

*The trial court erred in granting summary judgment in favor of Midtec*

### A. *Standard of review*

A moving party is entitled to summary judgment when the party establishes that it is entitled to the entry of judgment as a matter of law. (Code Civ. Proc., § 437c, subd. (c).) A defendant may make this showing by establishing that the plaintiff cannot establish one or more elements of all of his causes of action, or that the defendant has a complete defense to each cause of action. (*Towns v. Davidson* (2007) 147 Cal.App.4th 461, 466 [54 Cal.Rptr.3d 568].) "A party is entitled to summary adjudication of a cause of action if there is no

---

[4] The Right to Repair Act was enacted by the Legislature through Senate Bill No. 800 (2001–2002 Reg. Sess.) (Senate Bill 800).

triable issue of material fact and the matter can be adjudicated as a question of law. (Code Civ. Proc., § 437c, subds. (c), (f)(1).)" (*London Market Insurers v. Superior Court* (2007) 146 Cal.App.4th 648, 655 [53 Cal.Rptr.3d 154].)

In reviewing a trial court's ruling on a motion for summary judgment or summary adjudication, the reviewing court makes " 'an independent assessment of the correctness of the trial court's ruling, applying the same legal standard as the trial court in determining whether there are any genuine issues of material fact or whether the moving party is entitled to judgment as a matter of law. [Citations.]' " (*Trop v. Sony Pictures Entertainment, Inc.* (2005) 129 Cal.App.4th 1133, 1143 [29 Cal.Rptr.3d 144], quoting *Iverson v. Muroc Unified School Dist.* (1995) 32 Cal.App.4th 218, 222–223 [38 Cal.Rptr.2d 35]; see *Everett v. State Farm General Ins. Co.* (2008) 162 Cal.App.4th 649, 655 [75 Cal.Rptr.3d 812] ["On appeal from a motion for summary judgment or summary adjudication of issues we conduct a de novo review of the record."].)

B. *The trial court erred in granting judgment as a matter of law for Midtec on Greystone's indemnity claim*

Greystone claims that the trial court erred in concluding that the common law economic loss rule precludes a builder from seeking equitable indemnification from a jointly liable product manufacturer for the cost of repairing the damage caused by the manufacturer's violation of the Act's standards.

1. *The common law*

a. *Equitable indemnity*

█ Both builders and product manufacturers may be liable for construction defects that cause physical damage or property damage. (See, e.g., *Dow v. Holly Mfg. Co.* (1958) 49 Cal.2d 720, 725 [321 P.2d 736] [builder may be found liable in negligence for deaths caused by subcontractor's negligent installation of heater]; *Kriegler v. Eichler Homes, Inc.* (1969) 269 Cal.App.2d 224, 228–229 [74 Cal.Rptr. 749] [builder of mass-produced homes may be liable to homeowner on the basis of strict liability for defective heating system that causes physical damage]; *Casey v. Overhead Door Corp.* (1999) 74 Cal.App.4th 112, 123 [87 Cal.Rptr.2d 603] (*Casey*), disapproved on another ground in *Jimenez v. Superior Court* (2002) 29 Cal.4th 473, 481, fn. 1 [127 Cal.Rptr.2d 614, 58 P.3d 450] [homeowners entitled to present evidence of damages that did not constitute economic losses caused by manufacturer's negligence]; *Jimenez, supra,* 29 Cal.4th at p. 476 [concluding that a manufacturer of windows installed in mass-produced houses may be strictly liable in tort for defects in windows that cause damage to other parts of the houses].)

██ "Where multiple tortfeasors are responsible for an indivisible injury suffered by the plaintiff, each tortfeasor is jointly and severally liable to the plaintiff for those damages and thus may be held individually liable to the injured plaintiff for the entirety of such damages." (*Expressions at Rancho Niguel Assn. v. Ahmanson Developments, Inc.* (2001) 86 Cal.App.4th 1135, 1139 [103 Cal.Rptr.2d 895] (*Expressions at Rancho Niguel Assn.*).) Such liability is premised on the notion that " 'the "wronged party should not be deprived of his right to redress," but that "[t]he wrongdoers should be left to work out between themselves any apportionment." ' " (*Ibid.*)

Equitable indemnity is one manner by which joint tortfeasors may apportion such joint and several liability. "The right to indemnity flows from payment of a joint legal obligation on another's behalf. [Citations.]" (*Expressions at Rancho Niguel Assn., supra*, 86 Cal.App.4th at p. 1139.) "[J]oint and several liability in the context of equitable indemnity is fairly expansive. . . . [I]t is not limited to 'the old common term "joint tortfea-sor" . . . .' It can apply to acts that are concurrent or successive, joint or several, as long as they create a detriment caused by several actors. [Cita-tion.] [¶] One factor is necessary, however. With limited exception, there must be some basis for tort liability against the proposed indemnitor. [Citation.]" (*BFGC Architects Planners, Inc. v. Forcum/Mackey Construction, Inc.* (2004) 119 Cal.App.4th 848, 852 [14 Cal.Rptr.3d 721].)

██ In *GEM Developers v. Hallcraft Homes of San Diego, Inc.* (1989) 213 Cal.App.3d 419, 426–427 [261 Cal.Rptr. 626] (*GEM Developers*), this court outlined how the doctrine of equitable indemnity applies in the context of a construction defect case: "[T]he doctrine of comparative equitable indemnity is designed to do equity among defendants. Under the equitable indemnity doctrine, defendants are entitled to seek apportionment of loss between the wrongdoers in proportion to their relative culpability so there will be 'equitable *sharing* of loss between multiple tortfeasors.' [Citation.] The purpose of equitable indemnification is to avoid the unfairness, under joint and several liability theory, of holding one defendant liable for the plaintiff's entire loss while allowing another responsible defendant to escape ' "scot free." ' [Citation.] It is an extension of the comparative fault doctrine which allowed loss to be apportioned between plaintiff and defendants according to their respective responsibility for the loss. [Citation.]"

The *GEM Developers* court noted that the doctrine of equitable indemnity is not restricted to cases that involve tortfeasors who are liable in negligence, but rather, that equitable indemnity may also be used to apportion liability where " 'one or more tortfeasors' liability rests on the principle of strict liability.' " (*GEM Developers, supra*, 213 Cal.App.3d at p. 427, quoting *Safeway Stores, Inc. v. Nest-Kart* (1978) 21 Cal.3d 322, 330 [146 Cal.Rptr.

550, 579 P.2d 441].) Further, "a defendant may pursue a comparative equitable indemnity claim against other tortfeasors either (1) by filing a cross-complaint in the original tort action or (2) by filing a separate indemnity action after paying more than its proportionate share of the damages through the satisfaction of a judgment or through a payment in settlement." (*Evangelatos v. Superior Court* (1988) 44 Cal.3d 1188, 1197–1198 [246 Cal.Rptr. 629, 753 P.2d 585].)

"[A] defendant/indemnitee may[,] in an action for indemnity[,] seek apportionment of the loss on any theory that was available to the plaintiff upon which the plaintiff would have been successful." (*GEM Developers, supra*, 213 Cal.App.3d at p. 430.) " ' "[C]omparative equitable indemnity includes the entire range of possible apportionments, from no right to any indemnity to a right of complete indemnity. Total indemnification is just one end of the spectrum of comparative equitable indemnification." ' [Citation.]" (*Great Western Drywall, Inc. v. Interstate Fire & Casualty Co.* (2008) 161 Cal.App.4th 1033, 1041 [74 Cal.Rptr.3d 657].)

b. *The economic loss rule*

In *Aas, supra*, 24 Cal.4th at page 635, the Supreme Court considered whether a group of plaintiff homeowners could "recover in negligence from the entities that built their homes a money judgment representing the cost to repair, or the diminished value attributable to, construction defects that have not caused property damage." In answering this question in the negative, the *Aas* court relied on the economic loss rule, which it described as "settled law limiting the recovery of economic losses in tort actions . . . ." (*Id.* at p. 632.) The *Aas* court noted that in the seminal case of *Seely v. White Motor Co.* (1965) 63 Cal.2d 9 [45 Cal.Rptr. 17, 403 P.2d 145] (*Seely*), the court explicated the rationale for the economic loss rule: " 'The distinction that the law has drawn between tort recovery for physical injuries and warranty recovery for economic loss,' we wrote, 'is not arbitrary and does not rest on the "luck" of one plaintiff in having an accident causing physical injury. The distinction rests, rather, on an understanding of the nature of the responsibility a manufacturer must undertake in distributing his products.' [Citation.] A manufacturer 'can appropriately be held liable for physical injuries caused by defects by requiring his goods to match a standard of safety,' but not 'for the level of performance' of its products unless the manufacturer 'agrees that the product was designed to meet the consumer's demands.' [Citation.] Similarly, '[a] consumer should not be charged at the will of the manufacturer with bearing the risk of physical injury when he buys a product on the market. He can, however, be fairly charged with the risk that the product will not match his economic expectations unless the manufacturer agrees that it will.'

[Citation.]" (*Aas, supra,* 24 Cal.4th at pp. 639–640, quoting *Seely, supra,* 63 Cal.2d at p. 18.)

The *Aas* court noted that under California tort law, courts had applied the economic loss rule in construction defect cases to preclude the recovery of purely economic losses, i.e., those not accompanied by either property damage or physical injuries: "Speaking very generally, tort law provides a remedy for construction defects that cause property damage or personal injury. Focusing on the conduct of persons involved in the construction process, courts in this state have found such a remedy in the law of negligence. [Fn. omitted.] Viewing the home as a product, courts have also found a tort remedy in strict products liability, [fn. omitted] even when the property damage consists of harm to a sound part of the home caused by another, defective part. [Fn. omitted.] For defective products and negligent services that have caused neither property damage nor personal injury, however, tort remedies have been uncertain. Any construction defect can diminish the value of a house. But the difference between price paid and value received, and deviations from standards of quality that have not resulted in property damage or personal injury, are primarily the domain of contract and warranty law or the law of fraud, rather than of negligence. In actions for negligence, a manufacturer's liability is limited to damages for physical injuries; no recovery is allowed for economic loss alone. [Citation.] This general principle, the so-called economic loss rule, is the primary obstacle to plaintiffs' claim." (*Aas, supra,* 24 Cal.4th at pp. 635–636.)[5]

## 2. *The Right to Repair Act*

■ In response to the holding in *Aas*, the Legislature enacted the Right to Repair Act.[6] The Act establishes a set of standards for residential construction, and provides tort liability for entities that fail to meet the standards.

---

[5] The *Aas* court also rejected the homeowners' contention that they could recover their economic losses, including the costs to repair their homes, pursuant to the "special relationship" exception to the economic loss rule articulated in *J'Aire Corp. v. Gregory* (1979) 24 Cal.3d 799, 804–805 [157 Cal.Rptr. 407, 598 P.2d 60] (*J'Aire*). (See pt. III.D., *post*, for further discussion of *J'Aire*.)

[6] Greystone has filed two unopposed requests that this court take judicial notice of various portions of the legislative history of the Right to Repair Act. Specifically, in a January 7, 2008 request, Greystone asks that we take judicial notice of the text of Senate Bill 800, as first introduced in the Senate, the senate final history of Senate Bill 800, a "Floor Alert" from the California Building Industry Association submitted in support of Senate Bill 800, and a "Floor Alert" from the Personal Insurance Federation of California. In a June 17, 2008 request, Greystone asks that we take judicial notice of a document entitled "Senate Floor Alert[:] Home Ownership Advancement Foundation (HOAF) Supports SB 800 (Burton) Construction Defect Reform" and an enrolled bill report from California's Department of Consumer Affairs.

The legislative history Greystone presents has sufficient relevance to the issues on appeal to support our taking judicial notice of it. (See *Mangini v. R. J. Reynolds Tobacco Co.* (1994) 7 Cal.4th 1057, 1063 [31 Cal.Rptr.2d 358, 875 P.2d 73], overruled on another ground in *In re*

(§ 896.) Section 896 provides in relevant part: "In any action seeking recovery of damages arising out of, or related to deficiencies in, the residential construction, design, specifications, surveying, planning, supervision, testing, or observation of construction, a builder, and to the extent set forth in Chapter 4 (commencing with Section 910), a general contractor, subcontractor, material supplier, individual product manufacturer, or design professional, shall, except as specifically set forth in this title, be liable for, and the claimant's[7] claims or causes of action shall be limited to violation of, the following standards, except as specifically set forth in this title."

Section 896 goes on to provide a list of standards pertaining to residential construction with respect to, among other concerns, "water issues" (§ 896, subd. (a)), and "plumbing and sewer issues" (§ 896, subd. (e)).

Chapter 4 of the Act, beginning with section 910, establishes a series of prelitigation procedures that a claimant must pursue before filing an action against "any party alleged to have contributed to a violation of the standards." These procedures include a requirement that the claimant provide notice of claim "to the builder." (*Id.*, subd. (a).) The builder may elect to respond to the claim by inspecting the alleged violation (§ 916), offering to repair it (§ 917), and either repairing the violation, or arranging for a repair to be done (§§ 918, 921). If the builder fails to respond to the claim, or otherwise fails to comply with the requirements of the Act's prelitigation procedures, the claimant may bring an action for a violation of the Act's standards without further resort to the prelitigation procedures. (§§ 915, 920.) A claimant may also file an action for a violation of the Act's standards alleging an inadequate repair. (§ 927.)

Among the provisions in chapter 4 of the Act that are specifically made applicable to individual product manufacturers is section 936. Section 936 broadly provides that all of the provisions of the Act, other than the prelitigation procedures contained in chapter 4, apply to such manufacturers: "Each and every provision of the other chapters of this title apply to general contractors, subcontractors, material suppliers, individual product manufacturers, and design professionals to the extent that the general contractors,

*Tobacco Cases II* (2007) 41 Cal.4th 1257, 1276 [63 Cal.Rptr.3d 418, 163 P.3d 106] [stating that only relevant material may be judicially noticed].) For example, the documents support Greystone's contention that the Act represents a legislative response to the holding in *Aas*, and that the concerns of builders are among those that the Legislature addressed. Accordingly, we grant the unopposed requests for judicial notice. However, after careful review, we conclude that nothing in this legislative history is directly relevant to the issues on appeal. In particular, there is nothing in this legislative history that elucidates either the intended scope of section 936, or the Legislature's intent with respect to the liability of individual product manufacturers under the Act.

[7] As noted above (see fn. 3, *ante*), the Act defines "claimant" to include individual homeowners. (§ 895, subd. (f).)

subcontractors, material suppliers, individual product manufacturers, and design professionals caused, in whole or in part, a violation of a particular standard as the result of a negligent act or omission or a breach of contract. In addition to the affirmative defenses set forth in Section 945.5,[8] a general contractor, subcontractor, material supplier, design professional, individual product manufacturer, or other entity may also offer common law and contractual defenses as applicable to any claimed violation of a standard. All actions by a claimant or builder to enforce an express contract, or any provision thereof, against a general contractor, subcontractor, material supplier, individual product manufacturer, or design professional is preserved. [¶] Nothing in this title modifies the law pertaining to joint and several liability for builders, general contractors, subcontractors, material suppliers, individual product manufacturer, and design professionals that contribute to any specific violation of this title. However, the negligence standard in this section does not apply to any general contractor, subcontractor, material supplier, individual product manufacturer, or design professional with respect to claims for which strict liability would apply." (§ 936.)

■ The Act repeals the economic loss rule for claims that allege a violation of the Act's standards: "In order to make a claim for violation of the standards set forth in Chapter 2 (commencing with Section 896), a homeowner need only demonstrate, in accordance with the applicable evidentiary standard, that the home does not meet the applicable standard, subject to the affirmative defenses set forth in Section 945.5. No further showing of causation or damages is required to meet the burden of proof regarding a violation of a standard set forth in Chapter 2 (commencing with Section 896), provided that the violation arises out of, pertains to, or is related to, the original construction." (§ 942.)[9]

Accordingly, among the damages that a claimant may recover in an action pursuant to the Act are those "for the reasonable value of repairing any violation of the standards set forth in [the Act] . . . ." (§ 944.)

---

[8] Section 945.5 provides entities that are sued pursuant to the Act with a series of statutory affirmative defenses, including defenses related to: "unforeseen act[s] of nature" (§ 945.5, subd. (a)); a homeowner's failure to mitigate damages (§ 945.5, subd. (b)); a homeowner's failure to follow maintenance recommendations (§ 945.5, subd. (c)); damages caused by another party, ordinary wear and tear, or misuse (§ 945.5, subd. (d)); claims barred by the statute of limitations (§ 945.5, subd. (e)); claims barred by a release (§ 945.5, subd. (f)); and violations that have been adequately repaired (§ 945.5, subd. (g)). Section 945.5 further provides, "As to any causes of action to which this statute does not apply, all applicable affirmative defenses are preserved." (§ 945.5, subd. (h).)

[9] Construction defects that do not violate the standards remain actionable, subject to the economic loss rule. (§ 897.) Section 897 provides, "The standards set forth in this chapter are intended to address every function or component of a structure. To the extent that a function or component of a structure is not addressed by these standards, it shall be actionable if it causes damage."

3. *The Right to Repair Act abrogates the economic loss rule in actions brought pursuant to the Act by homeowners against individual product manufacturers*

Midtec's primary argument in seeking affirmance of the trial court's judgment is that the Act preserves the economic loss rule for claims against product manufacturers that allege a violation of the Act's standards. Midtec acknowledges that, pursuant to the Act, "a homeowner's construction defect claim against *a builder* is no longer subject to the economic loss doctrine" (italics added), and further acknowledges that "a defendant may seek apportionment of the loss on any theory available to the plaintiff upon which plaintiff would have been successful . . . ." However, Midtec contends that Greystone's equitable indemnity claim is barred because "*a product manufacturer* is liable to a homeowner for an unmet standard only if there is resultant damage to persons or property. . . ." (Italics added.) Midtec thus claims that it is not obligated to homeowners for economic losses under the Act, and that there is therefore no predicate tort upon which Greystone, as an indemnitee, may base its equitable indemnity claim.

In determining whether the economic loss rule precludes Greystone, as an indemnitee, from recovering economic losses in an indemnity action against Midtec, as an indemnitor, we first must address whether the economic loss rule would preclude a homeowner from collecting such damages in an action against Midtec, since Greystone's ability to pursue an indemnity action against Midtec under the Act is contingent on Midtec and Greystone sharing a joint legal obligation to the homeowners for economic losses caused by a violation of the Act's standards. (See *Fieldstone Co. v. Briggs Plumbing Products, Inc.* (1997) 54 Cal.App.4th 357, 367 [62 Cal.Rptr.2d 701] (*Fieldstone*) [applying common law as it existed prior to the enactment of the Right to Repair Act, and concluding that product manufacturers could not be liable to builder for economic losses pursuant to equitable indemnity claim, because manufacturers were not liable to homeowners for economic losses].)

■ Section 896 provides that individual product manufacturers shall be liable to homeowners for violations of the Act's standards to the extent set forth in chapter 4 of the Act. Section 936, which is contained within chapter 4, provides that "[e]ach and every provision" of the other chapters of the Act applies to product manufacturers to the extent that the manufacturer caused, in whole or in part, a violation of the Act's standards as the result of negligence or a breach of contract. Among those provisions that apply to individual product manufacturers are sections 942 and 944, which abrogate the economic loss rule and allow a homeowner who prevails on a claim for a violation of the Act's standards to recover the costs of repairing the violation. Thus, pursuant to the Act, a homeowner may recover economic losses from a

product manufacturer for a violation of the Act's standards that is caused by the manufacturer's negligence or breach of contract.[10]

Midtec's arguments to the contrary are unpersuasive. At the outset, we reject Midtec's suggestion, made at various points in its brief, that there are no provisions of the Act that attach new statutory liability to product manufacturers. Midtec argues, for example, "Nothing in this section [section 896] is directed at product manufacturers." Midtec similarly contends, "Nowhere in the language or the legislative history do we find any purpose other than providing a process for homeowners to obtain easier redress from *builders* for faulty construction . . . ." (Italics added.) Contrary to Midtec's assertions, sections 896 and 936 make it clear that product manufacturers face statutory liability for a violation of the Act's standards.[11]

Midtec claims that "the primary difference in treatment [between builders and other entities] in the scope of liability under section 936 is that while other entities may be sued under [the Act] for negligence or breach of contract causing a violation of the standards, common law defenses, such as the economic loss doctrine, are preserved for non-builder entities."[12] Midtec bases this argument on the italicized portion of section 936: "Each and every provision of the other chapters of this title apply to . . . individual product

---

[10] Section 910 bolsters this conclusion by providing that a claimant owner may bring an action for a violation of the Act's standards not only against a builder, but against "any party alleged to have contributed to a violation" of the Act's standards.

[11] Notably, elsewhere in its brief, Midtec acknowledges that "[t]he . . . statutes set forth in Chapter 4 . . . reveal the extent to which a product manufacturer may be implicated as referenced in the introductory paragraph to . . . section 896."

[12] In a response to an amicus curiae brief filed by the California Building Industry Association, Midtec asserted, for the first time, that as a *component* part manufacturer, it is not an "individual product manufacturer" under section 936, and that RTI is the "individual product manufacturer" in this case. Midtec reasserts this argument in a footnote in a supplemental letter brief.

In its opposition to Midtec's motion for summary judgment in the trial court, Greystone claimed that Midtec was an individual product manufacturer under the Act. Midtec did not dispute this contention in its reply to Greystone's opposition in the trial court. In its opening brief in this court, Greystone again claimed that Midtec was liable as a product manufacturer under the Act. In its respondent's brief, Midtec asserts that it is a "component part manufacturer" and states, "Section 936 outlines the extent to which entities other than builders, such as a component part manufacturer, can be liable."

Midtec failed to raise the argument that it is not an individual product manufacturer under sections 896 and 936 in either the trial court or in this court in a manner that would have afforded Greystone the opportunity to respond. Under these circumstances, we conclude that Midtec has forfeited this argument. (See *Premier Medical Management Systems, Inc. v. California Ins. Guarantee Assn.* (2008) 163 Cal.App.4th 550, 564 [77 Cal.Rptr.3d 695] [" ' " '[I]t is fundamental that a reviewing court will ordinarily not consider claims made for the first time on appeal which could have been but were not presented to the trial court.' " ' "].) Accordingly, we conclude that Midtec is an "individual product manufacturer" as referred to in sections 896 and 936 of the Act, for purposes of this appeal.

manufacturers . . . to the extent that the . . . individual product manufacturers . . . caused, in whole or in part, a violation of a particular standard as the result of a negligent act or omission or a breach of contract. In addition to the affirmative defenses set forth in Section 945.5, a[n] . . . *individual product manufacturer . . . may also offer common law* and contractual *defenses as applicable to any claimed violation of a standard.*" (*Ibid.*, italics added.)

 We do not find this argument to be persuasive. Most importantly, the economic loss rule is not a *defense* to a cause of action. Rather, the existence of damages other than purely economic loss is an *element* of a plaintiff's common law cause of action. (*Rosen v. State Farm General Ins. Co.* (2003) 30 Cal.4th 1070, 1079 [135 Cal.Rptr.2d 361, 70 P.3d 351] ["under the economic loss rule, 'appreciable, nonspeculative, present injury is an *essential element* of a tort cause of action' " (italics added)], quoting *Aas, supra,* 24 Cal.4th at p. 646; see also *Aas, supra,* 24 Cal.4th at p. 646 ["Construction defects that have not ripened into property damage, or at least into involuntary out-of-pocket losses, do not comfortably fit the definition of ' "appreciable harm" '—an essential *element* of a negligence claim." (italics added)].)

The necessity that a plaintiff present proof of the existence of damages other than purely economic loss arises from the fact that, rather than being a *defense* to a tort claim, the economic loss rule provides that entities generally have no *duty* to prevent purely economic loss to a potential plaintiff. (See *Ott v. Alfa-Laval Agri, Inc.* (1995) 31 Cal.App.4th 1439, 1448 [37 Cal.Rptr.2d 790] (*Ott*).) Under the common law, it is only where a "special relationship" exists, giving rise to such a duty (*J'Aire, supra,* 24 Cal.3d at p. 804), that a plaintiff may recover purely economic loss. (See *Aas, supra,* 24 Cal.4th at pp. 644–646 [noting that *J'Aire* relied on prior case law establishing "a case-by-case test for identifying such a duty"]; accord, *Ratcliff Architects v. Vanir Construction Management, Inc.* (2001) 88 Cal.App.4th 595, 605 [106 Cal.Rptr.2d 1] (*Ratcliff Architects*) [" 'Recognition of a duty to manage business affairs so as to prevent purely economic loss to third parties in their financial transactions is the exception, not the rule, in negligence law.' "].)

 While there is generally no duty to prevent economic loss to third parties in negligence actions at common law (*Ratcliff Architects, supra,* 88 Cal.App.4th at p. 605), the Right to Repair Act creates such a duty. (Cf. *Ratcliff Architects, supra,* 88 Cal.App.4th at p. 604 ["A duty of care may arise through *statute*, contract, the general character of the activity, or the relationship between the parties." (italics added)].) Midtec contends that "[t]he economic loss doctrine is a common law *defense* to negligence and strict liability claims" (italics added), and thus, that the provision in section 936 that an "individual product manufacturer . . . may . . . offer common law . . . defenses as applicable to any claimed violation of a standard" allows Midtec

to assert the economic loss doctrine as a defense to a claim under the Act. However, Midtec provides no authority for this assertion, and the contention is contrary to the *Aas* court's characterization of the economic loss rule as being an element of a plaintiff's cause of action.

Even assuming for the sake of argument that the economic loss rule could be characterized as a "defense," section 936 expressly provides that an individual product manufacturer may assert only those common law defenses that are "applicable" to a claim for a violation of the Act's standards. Given that a primary purpose of the Act is to abrogate the economic loss rule for a violation of the Act's standards, and that the first sentence of section 936 states that the provision of the Act that abrogates the economic loss rule (§ 942) applies to individual product manufacturers, it would be unreasonable to conclude that the Legislature intended, through the second sentence of section 936, to allow product manufacturers to assert the economic loss rule as a defense to such a claim. Both the fact that section 936 does not expressly refer to the economic loss rule, and that Midtec can point to nothing in the legislative history that suggests that the Legislature intended to preserve the applicability of the rule to entities whose liability under the Act is premised on section 936, provide further support for this conclusion.

A more reasonable interpretation of section 936 follows from the fact that, while under sections 896 and 942 a builder is *strictly liable* for any violation of the Act's standards,[13] pursuant to the first sentence of section 936, a product manufacturer is liable only where its "*negligent* act or omission or a breach of contract" (italics added), caused a violation of the Act's standards.[14] The reference to "common law and contractual defenses," in the second sentence of section 936 parallels the scope of duty articulated in the first sentence of the section. Thus, for example, in a suit premised on a

---

[13] We observe that although section 942 adopts a strict liability standard by providing for liability without a "showing of causation or damages," section 945.5 establishes a series of statutory affirmative defenses that are consistent with the "principles of comparative fault."

[14] In light of the Act's explicit adoption of a negligence standard for claims against product manufacturers, we reject Midtec's assertion that if this court were to conclude that the economic loss rule does not bar Greystone's claims, this would "expand the law of strict product liability beyond tolerable limits."

In this vein, we note that in a case that was decided after the Act's enactment, but that involved the law as it existed prior to the Act's enactment, the California Supreme Court disapproved of two cases, *Casey, supra*, 74 Cal.App.4th 112, and *La Jolla Village Homeowners' Assn. v. Superior Court* (1989) 212 Cal.App.3d 1131 [261 Cal.Rptr. 146] (*La Jolla Village*), and concluded that product manufacturers may be held strictly liable in tort for construction defects that cause physical damage to other parts of a house. (*Jimenez v. Superior Court, supra*, 29 Cal.4th at pp. 476, 481, fn. 1.) The Legislature's decision not to apply a strict liability standard to product manufacturers is consistent with the holdings in *Casey* and *La Jolla Village*. The common law has expanded the liability of product manufacturers in this regard, albeit subject to the economic loss rule, beyond that provided in section 936.

manufacturer's negligent act or omission, the manufacturer may assert traditional common law defenses to negligence actions, such as comparative negligence and primary assumption of risk, to the extent that such defenses are "applicable" (§ 936) to the plaintiff's claim. This interpretation of section 936 is consistent with the Act's abrogation of the economic loss rule, its reference to "common law . . . defenses," and the textual structure of section 936. We therefore reject Midtec's argument that an individual product manufacturer may assert the economic loss rule as a common law defense to an action against it under the Act.

In addition to rejecting Midtec's textual arguments, we also reject Midtec's claim that various public policy rationales require that we interpret the Act to preclude homeowners from recovering economic losses in tort actions against product manufacturers. Midtec argues that if this court were to hold that a product manufacturer may be liable for economic losses caused by a defective product, this would "eviscerate the long-standing line of demarcation between tort and contract law," and would cause there to be "no end to litigation," as various component manufacturers would be drawn into construction defect litigation.

The Legislature's choices in this area are entitled to heightened deference, as the *Aas* court itself recognized: "In our view, the many considerations of social policy this case implicates, rather than justifying the imposition of liability for construction defects that have not caused harm of the sort traditionally compensable in tort [citation], serve instead to emphasize that certain choices are better left to the Legislature. That body has at its disposal a wider range of options and superior access to information about the social costs and benefits of each. 'Legislatures, in making such policy decisions, have the ability to gather empirical evidence, solicit the advice of experts, and hold hearings at which all interested parties may present evidence and express their views . . . .' [Citations.]" (*Aas, supra*, 24 Cal.4th at p. 652.)

■ We conclude that the Right to Repair Act abrogates the economic loss rule in actions brought by homeowners against individual product manufacturers for a violation of the Act's standards based upon the manufacturer's negligence or breach of contract.

4. *A builder may bring an equitable indemnity action against a product manufacturer under the Act, seeking reimbursement for a homeowner's economic losses caused by the manufacturer's negligence or breach of contract*

The trial court concluded that "[Greystone] is not a homeowner or [homeowners association], and as a result is not entitled to pursue the

statutorily created cause of action." Midtec echoes this conclusion in its brief, noting that a builder is not a "claimant" authorized to bring an action under the Act (§ 895, subd. (f)), and arguing that Greystone is not among those entities that the Act is intended to protect. Midtec contends, "Inasmuch as the purpose of the statute was to address the concern over homeowner claims, not commercial transactions, the language of the pertinent statutes must be read in the context of a homeowner's claim against a builder."

██ If the question were whether Greystone could bring a *direct* action on its own behalf under the Act (see pt. III.D., *post*), these contentions would be well taken. However, they are inapposite in determining whether Greystone may bring a *derivative* equitable indemnity action.[15] A derivative equitable indemnity action is based on an indemnitee's joint legal obligation with an indemnitor to a third party, not the indemnitor's direct liability to the indemnitee. (See *Western Steamship Lines, Inc. v. San Pedro Peninsula Hospital* (1994) 8 Cal.4th 100, 114–115 [32 Cal.Rptr.2d 263, 876 P.2d 1062] [describing derivative nature of action for equitable indemnity]; accord, *GEM Developers, supra*, 213 Cal.App.3d at p. 430 [indemnitee may seek apportionment of loss to indemnitor upon any theory that injured third party could have successfully prevailed upon in action against indemnitor].)

This court rejected an argument similar to the one Midtec advances in *GEM Developers*. In that case, an indemnitor (Hallcraft) claimed that the indemnitee (GEM) could not pursue its equitable indemnification strict liability claim on behalf of a homeowners association because the indemnitee would not have been able to pursue a strict liability claim in a direct action against the indemnitor. (*GEM Developers, supra*, 213 Cal.App.3d at p. 429.) This court rejected the indemnitor's claim, reasoning that the indemnitee's claim was not premised on the indemnitor's underlying liability to the indemnitee, but rather, on the indemnitor's liability to an injured third party, a homeowners association. "Hallcraft sees GEM's action for equitable indemnification as being nothing more than a claim by one business against another business for a business loss, a loss which differs from that suffered by a consumer to which strict liability may apply. This reasoning ignores the origin of the loss. GEM's claim for equitable indemnification derives from the Association's loss and award of damages. Whether a defendant is held directly [liable] to the consumer/plaintiff for the plaintiff's loss or is held indirectly liable through a complaint for equitable indemnity, it is the same loss that is being apportioned—the loss suffered by the plaintiff/consumer." (*Ibid.*)

---

[15] By a "direct action," we refer to an action brought on the party's own behalf, such as Greystone's negligence cause of action against Midtec. A direct action may be contrasted with a derivative action, such as Greystone's claim for equitable indemnity.

The same reasoning applies here. Greystone's derivative equitable indemnity claim is premised on the homeowners' losses. Thus, the fact that Greystone could not prevail on a direct cause of action against Midtec (see pt. III.D., *post*) does not defeat Greystone's equitable indemnity claim.

 There is nothing in the Act that suggests that the Legislature intended to preclude indemnity claims under the Act. In fact, the Act expressly contemplates indemnity actions, and also the possibility that an indemnitee will bring, "a separate complaint for equitable indemnification" (*GEM Developers, supra*, 213 Cal.App.3d at p. 428), as has long been available under California common law. (See § 941 [establishing distinct statutes of limitation for an "action for indemnity" and for a "cross-complaint for indemnity"].) The conclusion that a defendant builder may bring such an indemnity action is further strengthened by the Legislature's recognition throughout the Act that a homeowner's loss may be caused by the actions of a number of different entities. (See §§ 916, subd. (e) ["[i]f a builder intends to hold [an] . . . individual product manufacturer . . . responsible for its contribution to the unmet standard"], 936 [providing for liability where a product manufacturer "caused, in whole or in part, a violation of a particular standard," and stating, "[n]othing in this title modifies the law pertaining to joint and several liability for builders, general contractors, subcontractors, material suppliers, individual product manufacturer, and design professionals that contribute to any specific violation of this title"].)

There is no language in the Act that would support Midtec's assertion that Greystone may assert only an express (i.e., contractual) indemnity claim, as opposed to an equitable indemnity claim. Midtec appears to acknowledge that the Act's statute of limitations provision contemplates the possibility of equitable indemnification actions in referring broadly to an "action for indemnity . . . ." (§ 941.) However, Midtec offers a narrow interpretation of section 941, arguing that "a builder may . . . be entitled to implied indemnity," only where a builder has a "special relationship" with another entity. Not only is there nothing in section 941 that would support such a limitation, but the claim is groundless on its face. Where a builder has a "special relationship" with an entity as described in *J'Aire*, the builder may pursue a *direct* action against that entity, and would not be limited to bringing a *derivative* action for implied equitable indemnification. (See pt. III.D., *post.*)

Finally, Midtec claims that the fact that a builder is in a better position than a homeowner to protect itself from economic loss via contract and warranty law supports an interpretation of the Act that would preclude Greystone from bringing an indemnity claim against a product manufacturer. This argument has little persuasive force in view of the fact that a builder's equitable

indemnity claim is, as discussed above, wholly derivative, and is based on the homeowners' losses. In any event, as with Midtec's other policy arguments, this argument is better addressed to the Legislature, not the courts. As the Act now stands, not only does it not preclude indemnity actions, but it expressly contemplates such claims. (See §§ 916, subd. (e), 936, 941.)[16]

### C. This court may not affirm the judgment on alternative grounds

"On appeal, we are concerned with the validity of the summary judgment ruling, not its reasoning." (*United Services Automobile Assn. v. Baggett* (1989) 209 Cal.App.3d 1387, 1391 [258 Cal.Rptr. 52].) Accordingly, we address whether this court may affirm the trial court's summary judgment in favor of Midtec on alternative grounds.

#### 1. The standards in section 896 are not limited to claims based on the faulty installation of plumbing products

Midtec claims that "the standards for plumbing systems outlined in section 896 refer only to the **installation** of plumbing products." Midtec further argues: "As [is] evident by the language of section 896, the focus of liability is directed to the builder as the person/entity with ultimate liability for the proper design and installation of a plumbing system. Nothing in this section is directed at product manufacturers."

Midtec's arguments are contrary to the plain text of the Act. Included among the standards that are set forth in section 896 are the following:

"The lines and components of the plumbing system, sewer system, and utility systems shall not leak." (§ 896, subd. (a)(14).)

"Plumbing lines, sewer lines, and utility lines shall not corrode so as to impede the useful life of the systems." (§ 896, subd. (a)(15).)

"Plumbing and sewer systems . . . shall not materially impair the use of the structure by its inhabitants." (§ 896, subd. (e).)

 Thus, the standards identified in section 896, subdivisions (a)(14), (15) and (e) do not, as Midtec contends, "refer only to the **installation** of plumbing products."

---

[16] We emphasize that in concluding that the economic loss rule does not preclude Greystone's indemnity claim, we express no opinion as to the merits of that claim. Therefore, the appropriate amount of Midtec's indemnification of Greystone, if any, remains at issue in this case. (See *Great Western Drywall, Inc. v. Interstate Fire & Casualty Co., supra,* 161 Cal.App.4th at p. 1041 [noting that the doctrine of comparative equitable indemnity allows for a full spectrum of apportionment of loss between defendants varying from no right to any indemnity to a right of complete indemnity].)

2. *Midtec has not established that there is no triable issue of material fact as to whether it caused a violation of the standards set forth in section 896*

We requested that the parties submit supplemental briefs addressing whether this court may affirm the judgment on the ground that Greystone is precluded from recovering damages for the replacement of fittings that had not yet failed, because such fittings did not, as a matter of law, violate the standards in section 896. Having reviewed the parties' supplemental briefs, we conclude that we may not affirm the judgment on this alternative ground.

Midtec's motion for summary judgment/adjudication was premised solely on its contention that the economic loss rule precludes Greystone's action. Thus, in opposing the motion, Greystone was not called upon, nor required, to present evidence regarding the degree to which nonfailed fittings were defective, and whether such defects present a material issue of fact with respect to whether Midtec violated one or more of the section 896 standards. (See Code Civ. Proc., § 437c, subd. (p)(2) [defining burdens of production with respect to summary judgment motions].) In its supplemental briefing, Greystone maintains that this court may not affirm the judgment on this alternative ground because Greystone "would provide more evidence if the factual issue was ever properly put before a trier of fact or the Court."

We agree with Greystone that in view of the undeveloped factual record on this issue, it would not be appropriate for this court to affirm the judgment on this alternative ground. (*Deveny v. Entropin, Inc.* (2006) 139 Cal.App.4th 408, 433 [42 Cal.Rptr.3d 807] ["Although we may affirm a ruling on a ground not adopted by the trial court, we decline to do so when, as in the present case, the alternative ground presents fact issues that the opposing party and trial court did not have an opportunity to address."]; accord, Code Civ. Proc., § 437c, subd. (m)(2) [specifying procedures by which a reviewing court may affirm a summary judgment on an alternative ground and noting that party opposing affirmance may argue "that additional evidence relating to that ground exists, but that the party has not had an adequate opportunity to present the evidence or to conduct discovery on the issue"].)

3. *Section 896, subdivision (g)(3)(E)*

Midtec also claims that the Act "specifically **excludes** from the entire title product liability claims that are based solely on a claim of a defective product," and maintains that Greystone's claim against Midtec constitutes such a claim. Midtec notes that section 896, subdivision (g)(3)(E) states: "This title does not apply in any action seeking recovery solely for a defect in a manufactured product located within or adjacent to a structure." In connection with this issue, Midtec requests that this court take judicial notice of a

letter drafted by John Burton, the author of Senate Bill 800, regarding section 896, subdivision (g)(3)(e), that was published in the August 31, 2002 edition of the Senate Journal. The letter states as follows:

"August 29, 2002

"*The Honorable Gregory P. Schmidt*

"*Chief Executive Officer*

"Dear Greg:

"There has been a request for clarification of Section 896(g)(3)(E) of SB 800. Under that section, if a homeowner brings a claim solely for a defect in a manufactured product and the homeowner includes the builder in the claim, the right to repair provisions apply to the claim against the builder. Otherwise, the statute does not apply in any action seeking recovery solely for a defect in a manufactured product located within or adjacent to a structure.

"Peace and Friendship,

"JOHN BURTON

"President pro Tempore"

(Sen. J. (2001–2002 Reg. Sess.) p. 6086.)

 A claim—such as Greystone's equitable indemnity claim—that a defect in a manufactured product constitutes a *violation of the standards established in section 896* is not an "action seeking recovery *solely* for a defect in a manufactured product." (§ 896, subd. (g)(3)(E), italics added; compare with § 897 ["To the extent that a function or component of a structure is not addressed by these standards, it shall be actionable if it causes damage."].) We conclude that section 896, subdivision (g)(3)(E) is intended to bar actions in which the claimant seeks to recover for a defect in a product that *does not* violate one of the standards set forth in section 896. Thus, the plain meaning of the Act defeats Midtec's argument that section 896, subdivision (g)(3)(E) precludes Greystone's action.

 Notwithstanding our conclusion that the plain meaning of section 896, subdivision (g)(3)(E) governs, we grant Midtec's unopposed request that we take judicial notice of the Burton letter. (See *Avila v. Citrus Community College Dist.* (2006) 38 Cal.4th 148, 155–156 [41 Cal.Rptr.3d 299, 131 P.3d 383] ["In the absence of an unambiguous plain meaning, we must look to

extrinsic sources such as legislative history to determine the statute's meaning."].) Assuming for the sake of argument that Senator Burton's letter is entitled to interpretative weight (see *People v. Bautista* (2008) 163 Cal.App.4th 762, 776–777 [77 Cal.Rptr.3d 824] ["intention of the bill's author is not . . . necessarily indicative of the intention of the Legislature as a whole in passing the bill"]), the letter provides no support for Midtec's argument. In his letter, Senator Burton tracks the language of section 896, subdivision (g)(3)(E) in stating that the Act does not apply to actions "solely" involving a manufactured product in or near a structure. Senator Burton does suggest in the letter that the right-to-repair provisions of the Act might apply to an action solely for a defect in a manufactured product if the homeowner included a builder in its claim. However, this statement does not support Midtec's claim that section 896, subdivision (g)(3)(E) broadly precludes all claims based on an alleged defect in a manufactured product. We therefore conclude that section 896, subdivision (g)(3)(E) does not preclude the application of the Act to Greystone's claims.

### 4. *Sections 910, 917, and 930, subdivision (b)*

As noted previously (see pt. III.C.2., *ante*), in the trial court, Midtec moved for summary judgment on only one ground—that the economic loss rule bars Greystone's claims. The trial granted Midtec's motion on this ground, concluding that Greystone may not pursue a "statutorily created cause of action," and that the economic loss rule bars Greystone's common law claims. However, the trial court also stated in its order, "[Greystone] provides no evidence demonstrating its compliance with the procedural prerequisites of S.B. 800, i.e. a pre-lawsuit notice and opportunity to repair. [(§§ 910, 917, 930, subd. (b).)]"[17]

On appeal, Greystone claims that this court may not affirm the trial court's order granting summary judgment on this alternative ground. Greystone correctly notes that the parties did not brief in the trial court whether Greystone, as a builder, was legally required to comply with the Act's prelitigation requirements. Further, even assuming for the sake of argument that these provisions do apply to this action, because neither the parties nor the trial court raised this issue prior to the trial court's ruling, Greystone was not required to present any evidence on the issue in opposing Midtec's motion for summary judgment. (Code Civ. Proc., § 437c, subd. (p)(2).)

---

[17] Section 910 specifies that prior to filing an action for a violation of the Act's standards, "the claimant," shall provide the "builder" a particular form of notice. Section 917 outlines a builder's right to provide a homeowner with a written offer to repair a violation. Section 930, subdivision (b) provides in relevant part, "If the claimant does not conform with the requirements of this chapter, the builder may bring a motion to stay any subsequent court action or other proceeding until the requirements of this chapter have been satisfied."

Midtec concedes on appeal that the trial court's statement concerning the lack of evidence of Greystone's compliance with the "procedural prerequisites of [the act]," "did not have any effect on the basis for the ruling," and asserts that the court's comment was "irrelevant to the basis for its ruling." Further, Midtec does not contend that this court may affirm the court's judgment on this alternative ground.

Accordingly, we conclude that we may not affirm the judgment on the ground that Greystone failed to comply with the Act's "procedural prerequisites," as stated by the trial court.

### 5. Section 916, subdivision (e)

Section 916, subdivision (e) provides in relevant part: "If a builder intends to hold a[n] . . . individual product manufacturer, or material supplier, including an insurance carrier, warranty company, or service company, responsible for its contribution to the unmet standard, the builder shall provide notice to that person or entity sufficiently in advance to allow them to attend the initial, or if requested, second inspection of any alleged unmet standard and to participate in the repair process."

In its respondent's brief, Midtec acknowledges, "Whether or not Greystone complied with th[e] mandatory provision [in section 916, subdivision (e)] is irrelevant for the purposes of this appeal . . . because the summary judgment motion was based on the application of the economic loss doctrine, not the application of the notice provision."

Having received and considered supplemental briefing from the parties regarding the effect of section 916, subdivision (e), if any, on the proper disposition of this case, we agree with Midtec's implicit concession in its respondent's brief that we may not affirm the summary judgment on any ground related to this provision, in light of the fact that Midtec's motion for summary judgment was based solely on the applicability of the economic loss rule to Greystone's action. (See *Deveny v. Entropin, Inc., supra,* 139 Cal.App.4th at p. 433; Code Civ. Proc., § 437c, subd. (m)(2).)

### D. Proceedings on remand

In view of our conclusion that the trial court erred in granting judgment as a matter of law in favor of Midtec on Greystone's indemnity cause of action, we must remand the matter to the trial court. (See *Wall Street Network, Ltd. v. New York Times Co.* (2008) 164 Cal.App.4th 1171, 1176 [80 Cal.Rptr.3d 6] [" '[a] defendant is entitled to summary judgment if the record establishes as a matter of law that *none* of the plaintiff's asserted causes of action can prevail' " (italics added)].)

In its motion for summary judgment or, in the alternative, for summary adjudication, Midtec stated, "If, for any reason, this Court believes that it cannot grant summary judgment, Midtec respectfully requests that this court grant summary adjudication as to each of Greystone's causes of action against Midtec . . . ." Because the trial court granted Midtec's motion for summary judgment, it did not rule on Midtec's alternative motion for summary adjudication. On remand, the trial court must rule on Midtec's alternative motion for summary adjudication.

1. *We express no view on the merits of Greystone's procedural objection to Midtec's motion for summary adjudication, or on the propriety of granting summary adjudication on Greystone's declaratory relief action*

In its opposition to Midtec's alternative motion for summary adjudication, Greystone argued that Midtec's alternative motion is procedurally defective because it does not comply with California Rules of Court, former rule 342(b) (current Cal. Rules of Court, rule 3.1350(b)), in that Midtec has not provided a separate statement of undisputed facts pertaining to each of Greystone's causes of action. In light of its ruling granting summary judgment, the trial court did not rule on this claim. Neither party has addressed this issue on appeal. For these reasons, we express no opinion on its merits.

The trial court also did not rule on Midtec's alternative motion for summary adjudication as it pertains to Greystone's declaratory relief claim. Neither party has raised any arguments as to this claim, and we therefore express no opinion as to the merits of this claim either.

On remand, we direct the trial court to address these issues in ruling on Midtec's motion for summary adjudication.

2. *To the extent that the trial court determines that it may consider Midtec's motion for summary adjudication of Greystone's negligence claim, Midtec is entitled to judgment as a matter of law*

Greystone claims on appeal that the trial court erred in granting judgment as a matter of law in favor of Midtec on Greystone's negligence claim. To the extent that the trial court rejects Greystone's argument that the court must deny Midtec's alternative motion for summary adjudication as procedurally improper (see pt. III.D.1., *ante*), we conclude that the trial court must grant summary adjudication in Midtec's favor on Greystone's negligence claim.[18]

---

[18] In its opposition to Midtec's motion for summary judgment, Greystone argued that the economic loss rule does not preclude it from prevailing on its claims. However, Greystone did not refer to either the negligence per se doctrine or the *J'Aire* decision. Assuming for the sake

Greystone argues that it may pursue its negligence claim against Midtec, without regard to the economic loss rule, under two separate theories. Greystone first contends that Midtec's negligent violation of the standards contained in the Right to Repair Act constitutes negligence per se, and that Greystone may recover its economic losses caused by such negligence by way of a direct claim for negligence. Greystone also argues that, in the wake of the enactment of the Right to Repair Act, it may now pursue a negligence cause of action in which it may recover economic losses, pursuant to the "special relationship" theory of negligence liability provided in *J'Aire, supra,* 24 Cal.3d 799. We reject both arguments.

### a. *Greystone may not pursue a claim of negligence per se against Midtec*

■ The doctrine of negligence per se is based on "the rule that a presumption of negligence arises from the violation of a statute which was enacted to protect a class of persons of which the plaintiff is a member against the type of harm that the plaintiff suffered as a result of the violation." (*Quiroz v. Seventh Ave. Center* (2006) 140 Cal.App.4th 1256, 1285 [45 Cal.Rptr.3d 222] (*Quiroz*).) Therefore, a party who seeks to prevail on a cause of action premised on the negligence per se doctrine must establish, among other elements, that the party is "one of the class of persons for whose protection the statute, ordinance, or regulation was adopted." (*Ibid.*) The court determines this element as a matter of law. (*Ibid.*)

As noted previously (see fns. 3, 7, *ante*), section 895, subdivision (f) provides, " 'Claimant' or 'homeowner' includes the individual owners of single-family homes, individual unit owners of attached dwellings and, in the case of a common interest development, any association as defined in subdivision (a) of Section 1351." Section 896 establishes a cause of action in which such claimants may allege a violation of the Act's standards.

■ Throughout the Right to Repair Act, there are references to the action that a "claimant" or a "homeowner" may bring for a violation of the standards adopted therein. (See, e.g., § 910 ["Prior to filing an action against any party alleged to have contributed to a violation of the standards set forth in Chapter 2 (commencing with Section 896), the *claimant* shall initiate the following prelitigation procedures . . . ." (italics added)]; § 920 ["If the builder fails to make an offer to repair or otherwise strictly comply with this

---

of argument that Greystone has forfeited these arguments, we nevertheless exercise our discretion to consider them on the merits. (See *People v. Williams* (1998) 17 Cal.4th 148, 161, fn. 6 [69 Cal.Rptr.2d 917, 948 P.2d 429] [appellate court has discretion to consider claims that are not properly preserved for review].)

chapter within the times specified, the *claimant* is released from the requirements of this chapter and may proceed with the filing of an action" (italics added)]; § 942 ["In order to make a claim for violation of the standards set forth in Chapter 2 (commencing with Section 896), a *homeowner* need only demonstrate, in accordance with the applicable evidentiary standard, that the home does not meet the applicable standard, subject to the affirmative defenses set forth in Section 945.5" (italics added)]; § 944 ["If a claim for damages is made under this title, the *homeowner* is only entitled to damages for [listing types of damages" (italics added)].)

In contrast, there is not a single instance in which the Right to Repair Act refers to a direct action brought by a *builder* against an entity of any kind. There is nothing in the language of the Right to Repair Act that suggests that the Act was intended to protect the class of persons of which Greystone is a member against the type of harm that Greystone suffered as a result of Midtec's alleged violation. (See *Quiroz, supra,* 140 Cal.App.4th at p. 1285.)

Greystone argues that the provisions within the Right to Repair Act that specify certain prelitigation procedures that a claimant must follow prior to bringing an action, and the law's reference to indemnity actions, indicate that builders are among those the law "meant to be protected." We disagree. As to the prelitigation requirements, the fact that the Legislature provided a set of procedures that a claimant must follow before suing a builder as a *defendant* does not indicate that the Legislature intended for the Act to protect a builder as a *plaintiff* against harms done to it by other entities mentioned in the Act. As to the Act's reference to an indemnity action (§ 941), whether a builder may bring an indemnity action in which it asserts the rights of third party homeowners is entirely distinct from the question whether the law was intended to protect builders as plaintiffs asserting a direct cause of action. (Cf. *Regan Roofing Co. v. Superior Court* (1994) 21 Cal.App.4th 1685, 1713 [27 Cal.Rptr.2d 62] ["The direct action for negligence and the derivative action for indemnity constitute wholly independent rights."].) Therefore, the fact that section 941 refers to an indemnity action in which a builder may be able to assert the rights of homeowners, does not demonstrate that the Legislature intended to protect builders as plaintiffs asserting their own rights.

Citing two legislative committee reports for Senate Bill 800, Greystone argues that the Act "was meant to protect both homeowners and builders, establishing builders' position within the class meant to be protected." However, Greystone fails to identify any specific language in either report, and we have found none, that supports this claim. Specifically, statements in the reports such as, "[a]mong other things, the bill seeks to respond to

concerns expressed by builders and insurers over the costs associated with construction defect litigation" (Sen. Com. on Judiciary, Analysis of Sen. Bill No. 800 (2001–2002 Reg. Sess.) as amended Aug. 28, 2002, p. 1), and "[t]his bill, the consensus product resulting from nearly a year of intense negotiations among the interested parties" (Assem. Com. on Judiciary, Rep. on Sen. Bill No. 800 (2001–2002 Reg. Sess.) as amended Aug. 26, 2002, p. 1), do not demonstrate that a builder may bring a negligence claim against a product manufacturer premised on the negligence per se doctrine for a violation of the Right to Repair Act.

We conclude that Greystone may not recover its economic losses from Midtec in a negligence cause of action that is premised on the negligence per se doctrine.[19]

> b. *Greystone may not pursue a negligence action against Midtec based on the "special relationship" theory of liability provided in* J'Aire, supra, *24 Cal.3d 799*

 Greystone argues that in the wake of the enactment of the Right to Repair Act, it shared a "special relationship" with Midtec as defined in *J'Aire, supra,* 24 Cal.3d at page 804, sufficient to allow it to recover economic losses caused by Midtec's alleged negligence. Where such a relationship exists, there exists "a duty on the part of the defendant to use due care to avoid economic injury to the plaintiff." (*Ott, supra,* 31 Cal.App.4th at p. 1448.) Whether such a special relationship and duty of care exist presents a question of law for the court. (*Id.* at p. 1449, fn. 6.)

 In *J'Aire,* the Supreme Court set "forth a limited exception to the general rule that economic loss alone is insufficient to state a negligence cause of action . . . ." (*Zamora v. Shell Oil Co.* (1997) 55 Cal.App.4th 204, 211 [63 Cal.Rptr.2d 762] (*Zamora*).) The *J'Aire* court considered whether "a

---

[19] In its opening brief, Greystone stated, "The definition of 'claimant' states that it 'includes the individual owners of single family homes,' and 'any association as defined in subdivision (a) of Section 1351,' but provides no restrictive definition." (Quoting § 895, subd. (f).) However, Greystone did not contend in its opening brief that it could bring its negligence claim as a "claimant" under section 895. In its reply brief, Greystone does suggest, for the first time, that it is a claimant under section 895. Greystone argues, "the very first owner of each home and the source of the chain of title is the builder," and contends that it occupies a "unique position as a builder *and* as a homeowner." Greystone has not provided any good reason why it did not raise this contention until its reply brief. Accordingly, the argument is forfeited and we decline to consider whether Greystone may bring its negligence cause of action as a "claimant" pursuant to section 895. (See *Shade Foods, Inc. v. Innovative Products Sales & Marketing, Inc.* (2000) 78 Cal.App.4th 847, 894, fn. 10 [93 Cal.Rptr.2d 364] [" ' "points raised in the reply brief for the first time will not be considered, unless good reason is shown for failure to present them before" ' "].)

contractor who undertakes construction work pursuant to a contract with the owner of premises may be held liable in tort for business losses suffered by a lessee when the contractor negligently fails to complete the project with due diligence." (*J'Aire, supra*, 24 Cal.3d at p. 802.) In answering this question in the affirmative, the *J'Aire* court observed that the court's prior cases had established that, "Where a special relationship exists between the parties, a plaintiff may recover for loss of expected economic advantage through the negligent performance of a contract although the parties were not in contractual privity." (*Id.* at p. 804.) Determining whether such a relationship exists involves an examination of the following criteria: "(1) the extent to which the transaction was intended to affect the plaintiff, (2) the foreseeability of harm to the plaintiff, (3) the degree of certainty that the plaintiff suffered injury, (4) the closeness of the connection between the defendant's conduct and the injury suffered, (5) the moral blame attached to the defendant's conduct and (6) the policy of preventing future harm. [Citation.]" (*Id.* at p. 804.)

In considering the first two criteria, the *J'Aire* court stressed that the close relationship between the parties made it highly foreseeable that the contractor's negligence would harm the tenant: "(1) The contract entered into between [contractor] and the [owner] was for the renovation of the premises in which [lessee] maintained its business. The contract could not have been performed without impinging on that business. Thus [contractor's] performance was intended to, and did, directly affect [lessee]. (2) Accordingly, it was clearly foreseeable that any significant delay in completing the construction would adversely affect [lessee's] business beyond the normal disruption associated with such construction. [Lessee] alleges this fact was repeatedly drawn to [contractor's] attention." (*J'Aire, supra*, 24 Cal.3d at pp. 804–805.)

In *Fieldstone, supra*, 54 Cal.App.4th at pages 368–369, this court applied *J'Aire* in concluding that neither Fieldstone, a homebuilder, nor a group of homeowners, shared a special relationship with the manufacturers of sinks that Fieldstone installed in the homes that would support tort liability for economic damages. The *Fieldstone* court reasoned: "Fieldstone's analysis fails because the evidence does not suggest the transactions in question were intended to affect Fieldstone or the homeowners 'in any way particular to [them], as opposed to all potential purchasers of the equipment. The absence of this foundation precludes a finding of "special relationship" as required by *J'Aire*: to the extent the [product] was intended to affect [Fieldstone or the homeowners] in the same way as all retail buyers, this becomes a traditional products liability or negligence case in which economic damages are not available. [Citation.]' ([*Ott*], *supra*, 31 Cal.App.4th at pp. 1455–1456, fn. omitted.) We need not consider the remaining parts of the *J'Aire* test. 'Even if [they] weighed in favor of finding a duty of care, we would still

conclude that no duty existed. If a duty of care to avoid economic injury existed in the circumstances of the present case, every manufacturer would become an insurer, potentially forever, against economic loss from negligent defects in a product used for its intended purpose. *J'Aire* neither requires nor supports such a radical departure from traditional notions of liability.' ([*Ott, supra,* 31 Cal.App.4th at pp. 1455–1456].)" (*Fieldstone,* at pp. 368–369.)

Similarly, in *Zamora, supra,* 55 Cal.App.4th at pages 211–212, this court applied *J'Aire* and concluded that a manufacturer of resin used in the plumbing systems of homes did not have a special relationship with homeowners sufficient to support a negligence cause of action for economic losses. The *Zamora* court reasoned, "Shell's manufacture of PB resin did not involve a transaction specifically intended to affect the particular needs of any of the 14 homeowners . . . ." (*Zamora, supra,* 55 Cal.App.4th at p. 212; accord, *Ott, supra,* 31 Cal.App.4th at p. 1457, fn. 10 [defendants, manufacturers of automated cow milking machines, did not have special relationship under *J'Aire* with dairy owners who purchased milking machine where there was no evidence "defendants took action intended to affect plaintiffs, nor that defendants reasonably could foresee any economic injury from malfunctioning equipment above that which *any* dairy would suffer if its milking system were substandard"]; see generally *Platte Anchor Bolt, Inc. v. IHI, Inc.* (N.D.Cal. 2004) 352 F.Supp.2d 1048, 1054 [reviewing cases and concluding "California courts have been able to prevent the expansion of manufacturer liability for economic injuries suffered by a retail buyer *at large,* while at the same time allowing a particular party of whom the manufacturer had *specific knowledge* to go forward with a negligence action."].)

Although Greystone essentially acknowledges that its claim fails under *Fieldstone,* it contends that the Right to Repair Act alters the *J'Aire* analysis, arguing: "In *Fieldstone,* the first factor defeated the [*J'Aire*] test because products manufactured for use in building homes (i.e. by builders and homeowners) were not somehow marked out as *different from any other purchases.* [Citation.] Section 896 remedies this problem. Similarly, the relationships between homeowners, builders, and the builders' suppliers are at the heart of the Right to Repair [Act] and all are now aware that these transactions are indeed 'different'. [See §§ 896, 936.] The first factor thus now weighs in favor of a 'special relationship' imposed by law." (Italics added.)

We disagree. None of the applications of *J'Aire* in the cases cited above depended on whether the product at issue in the case differed from *other products,* as Greystone suggests in the italicized portion of its brief, quoted above. Rather, the *Fieldstone, Zamora,* and *Ott* courts all held that the product manufacturers in those cases did not share a special relationship with

ordinary buyers of the products (or those who purchased homes in which the product was incorporated) because the purchasers and homeowners were no different from any other purchaser of the *same product*. (See, e.g., *Fieldstone, supra*, 54 Cal.App.4th at p. 368.) In other words, the rationale of *Fieldstone* is that the *J'Aire* test was not met because the sink sales at issue were like any other sink sale made by the product manufacturer—i.e., the product manufacturer had not specially made the sink for the benefit of the builder or the homeowners. (*Fieldstone, supra*, 54 Cal.App.4th at p. 368.) Similarly, in *Zamora*, the product manufacturer had not intended to meet the "particular needs of any of the 14 homeowners" (*Zamora, supra*, 55 Cal.App.4th at p. 212), and in *Ott*, the purchasers of the milking machine suffered the same harm from the defective machine that any milking machine purchaser would have suffered (*Ott, supra*, 31 Cal.App.4th at p. 1455).

 There is nothing in any of these cases that supports Greystone's suggestion that a proper application of *J'Aire* is based on whether the product at issue in the case is somehow regulated differently from other products in the marketplace. Thus, the analysis of the first *J'Aire* criterion—"the extent to which the transaction was intended to affect the plaintiff" (*J'Aire, supra*, 24 Cal.3d at p. 804)—remains the same in the wake of the enactment of the Right to Repair Act. There is nothing in Act that alters the analysis of whether a manufacturer's sale of a product that is incorporated into residential construction in California was intended to affect a builder. Both before the passage of the Right to Repair Act and after, ordinary product manufacturers having no special knowledge of the manner in which their products will be used by a particular builder do not have a "special relationship" with the builder that would support a negligence cause of action for economic losses pursuant to *J'Aire*.

In this case, Midtec manufactured the fittings at issue for another entity, RTI, who in turn, incorporated the fittings into a plumbing system. A plumbing contractor, Production Plus Plumbing, incorporated the RTI plumbing system into homes that Greystone was building. Under these circumstances and in light of the holdings in *Fieldstone, Zamora,* and *Ott*, Midtec's sale of the fittings was not intended to affect Greystone in a manner sufficient to give rise a duty on Midtec's behalf to use due care to avoid economic injury to Greystone. As in *Fieldstone*, this conclusion is dispositive of the *J'Aire* analysis. (*Fieldstone, supra*, 54 Cal.App.4th at p. 368.) Accordingly, we conclude, as a matter of law, that Midtec did not have a special relationship with Greystone sufficient to support a negligence cause of action for economic losses pursuant to *J'Aire*.

## IV.

## DISPOSITION

The judgment is reversed. The matter is remanded to the trial court with directions to deny Midtec's motion for summary judgment. On remand, the trial court is directed to consider Greystone's procedural objection to Midtec's alternative motion for summary adjudication. To the extent the trial court determines that it may consider Midtec's motion for summary adjudication on the merits, the trial court is directed to deny the motion as to Greystone's indemnity cause of action, to grant the motion as to Greystone's negligence cause of action, and to consider the motion as to Greystone's declaratory relief cause of action, all in accordance with the views expressed in this opinion. Each party is to bear its own costs on appeal.

McConnell, P. J., and McDonald, J., concurred.