Filed 10/28/13  Irena, Inc. v. United States Gypsum Co. CA2/7

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SEVEN

| | |
|---|---|
| IRENA, INC.,<br><br>        Plaintiff and Respondent,<br><br>v.<br><br><br>UNITED STATES GYPSUM COMPANY,<br><br>        Defendant and Appellant. | B239727<br><br><br>(Los Angeles County<br>Super. Ct. No. YC060933) |

        APPEAL from a judgment of the Superior Court of Los Angeles County, Dudley W. Gray II, Judge.  Reversed and remanded.

        Theodora Oringher, Richard J. Decker, David E. Mead and Stacey L. Zill for Defendant and Appellant.

        Agnewbrusavich and Stephen C. Rasak; The Arkin Law Firm and Sharon J. Arkin for Plaintiff and Respondent.

_____

United States Gypsum Company ("USG") appeals from the judgment entered after a bench trial in favor of Irena, Inc. ("Irena"), on Irena's complaint against USG alleging causes of actions for negligence and strict liability arising from Irena's use of an USG's defective construction product which caused damage to a home that Irena had renovated. On appeal, USG asserts that as a matter of law, the court erred in awarding Irena consequential damages in the form of "carrying costs" in addition to the costs of repair. In addition, USG argues that even if Irena was entitled to consequential damages, that the award was excessive and that the evidence presented at trial did not support it. As we shall explain, the award of consequential damages in this case lacks a basis in law, and accordingly, we reverse and remand for further proceedings.

*FACTUAL AND PROCEDURAL BACKGROUND*

**Plaintiffs and the Property.**

Irena, a real estate development company owned by Carla Tumanjan, is in the business of constructing new residential properties and remodeling existing homes in the Palos Verdes area. Mrs. Tumanjan's husband, Michael Tumanjan, is a general contractor and manager for the company's remodeling and construction projects. Mr. Tumanjan had served as the general contractor for a number single-family "high-end homes" in the area.

In May 2006, Irena purchased an existing 3,500 square foot home in Palos Verdes Estates located at 900 Via Del Monte (the "Property") for $1.7 million dollars. The plan for the Property was to demolish a portion of the existing home, to remodel certain rooms and to add an additional 3,000 square feet of new construction. To finance the purchase and construction, Irena obtained a loan from First California Bank for $2.1 million. Although under the original terms, the loan was due in February 2008, that date was later extended until November 2009.

In November 2006, construction on the Property began. The installation of the drywall began in June of 2007, and after it was installed, the drywall joints and fasteners were covered with tape and a joint compound. The product as issue in this case – USG's topping or finishing compound – was placed over the other compound. This portion of the work was completed in August 2007. Thereafter, the walls and ceiling were painted

2

with layers of primer paint and final coats of paint. In March 2008, the paint-work was complete.

According to Mr. Tumanjan, by August 2008, only 2-3 weeks of work was left to be completed on the Property, and he anticipated that the home would be ready to be listed for sale by the end of the month. At the time, he opined the finished home would be worth between $3.2 and $3.4 million. Mr. Tumanjan also anticipated that the home would be on the market for between 60-90 days and would close escrow by December 2008.

### Problems with USG's Product and the Repair Process

Beginning in the fall of 2007 and through August 2008, areas in the home where USG's topping compound had been applied and then painted over began to show signs of delamination: the paint and primer began to peel off of the wall. Initially the cause of the problem was not known and thus to address the issue, Irena had the damaged paint removed and the affected areas were re-primed and re-painted. These efforts did not fix the problem.

In August 2008, the painting subcontractor contacted USG and an investigation into the cause of the problem began. Irena also consulted with a paint and finish expert. Several proposals to repair the delamination problem were considered, including replacing all of the drywall where the compound had been used. Ultimately, it was decided that the most cost effective repair would be to remove all of the paint and primer where the compound had been applied, to sand the drywall to completely remove it, to apply a different compound, to smooth the finish to blend with the other areas of the surface, and then repaint the affected areas.

The repairs began in January 2009. Approximately 15,696 square feet of walls and ceiling surface were affected by delamination problem and thus were subject of the repair and repainting process. The drywall repair and repainting was complete by May 2009. Between May and October 2009, Irena worked to blend and repaint those areas where the drywall intersected with other surfaces including cabinets, tile and baseboards. According to Mr. Tumanjan, by October 2009, the home had been repaired and placed in

3

the condition it would have been in by the end of August 2008, but for the delamination problems.

### Financing Issues

During the trial, Mr. Tumanjan testified that the construction loan was due to be paid off by November 1, 2009. According to Mr. Tumanjan, in light of the repairs to the home resulting from the delamination problem, the house could not be listed and sold by the date that the construction loan was due. As a result, in April 2009, Irena requested a loan extension. California First Bank would not agree to extend the loan beyond November 2009 and indicated that it wanted the loan paid in full by that date. Irena retained a loan broker to find a replacement loan that could be used to pay off the construction loan by the November 2009 due date.

The only loan available at that time was a standard homeowners mortgage from Union Bank. In November 2009, Union Bank agreed to accept an application for the loan and began to process it. Under the terms of the Union Bank loan agreement the home had to be "owner-occupied." Accordingly to satisfy this condition, during the loan application process Irena executed a quitclaim deed to Mr. and Mrs. Tumanjan. The owner-occupy condition also precluded the Tumanjans from listing the home for sale during the loan approval process.

In December 2009, the construction loan went into default. However, because Irena was attempting to obtain financing during the winter and spring of 2010, California First Bank granted several loan extensions, extending the loan until June 2010. After an infusion of new capital into the bank in June 2010, California First Bank ultimately agreed to rewrite the construction loan and to extend it for another three years. As a result of the new loan, the Tumanjans withdrew the application with Union Bank, executed a grant deed for the Property to Irena. In July 2010, Irena listed the Property for sale for $2.795 million. The home sold in March of 2011 and Irena received about $2.5 million from the sale.

4

**Litigation and Trial**

Irena filed a complaint against USG asserting causes of action for strict liability products liability based on design defect and negligence. Irena sought as damages the cost to investigate and repair the Property (approximately $118,000) and damages of approximately $391,000 resulting from the "carrying costs"[1] incurred by Irena between August 2008 and July 2010 while the house was undergoing repairs and new financing was sought.

The case proceeded to a bench trial in August 2011. During the trial, in addition to the testimony of Mr. Tumanjan and the painting subcontractor, each party presented expert testimony regarding the scope of the necessary repairs, the cost to fix the delamination problem, and the time required to repair the damage. Both parties also presented testimony from real estate appraisal and market professionals. At the end of the trial the parties submitted briefs in lieu of oral argument.

In addition to contesting liability, USG argued that Irena was not entitled to any damages beyond the reasonable cost of repairing the harm. USG asserted that as a matter of law, Irena was not entitled to any "carrying costs." USG asserted that both the "Right to Repair Act" (Civil Code sections 895 et seq.) and common law precluded an award of consequential damages in the case. In the alternative, USG asserted that even if such damages were allowed, that an award for the 23 months for investigation, repair and refinancing time was excessive. USG pointed out that its expert testified that the repairs could have been complete in 60-90 days. USG also argued that Irena was not entitled to any award of damage while it sought refinancing of the construction loan based on

---

[1]    Mr. Tumanjan testified as to the "carrying costs." He described that from August 2008 through July 2010 these costs included monthly interest paid on the construction loan, property taxes, insurance, security service, certain utilities including gas, water and electricity service and pool maintenance. The charges were detailed in Exhibit 85. After correcting the exhibit to remove some items, Mr. Tumanjan testified that the carrying costs totaled $391,663.47. Irena did not seek any carrying costs for the period after the Property was listed for sale in July 2010, nor for the principal payments made on the loan during the August 2008 to July 2010 time period.

5

USG's real estate expert's testimony. USG's expert opined that in view of the real estate market conditions in 2008-2010, even if the house had not suffered any damage from USG's product, Irena would have been required to refinance the loan because the home would have been on the market for approximately 18 months (if listed in August 2008), and thus the fact that Irena incurred costs related to the loan refinancing should not be attributed to USG.

On October 21, 2011, the court issued its order and findings. The court found that Irena had proved its design defect theory of strict product liability, and concluded that USG's defective product caused damage to the Property. As to the extent of the damage, the court awarded a total of $468,412.98, finding that Irena was entitled to the costs of investigation and repair of the Property, and citing the Civil Code 3333, to an award of consequential damages. USG requested a statement of decision, and the court directed Irena to prepare a proposed statement. Irena filed a proposed statement of decision and USG filed its objections to the proposed statement.

On February 1, 2012, the court signed the statement of decision and entered judgment in favor of Irena. In the statement of decision, the court found that Irena was entitled to both the costs of repair and the consequential damages in the form of its carrying costs. The court found that "but for" the damaged caused by USG's defective compound, the Property would have been listed for sale in August 2008 and because of the delays in the construction caused by USG's product the house could not be listed for sale until July 2010. The court concluded that the Right to Repair Act did not apply to the case. The court also rejected USG's construction expert who testified as to the extent and reasonable time for repairs. Instead, the court accepted the opinions of Irena's experts on the matters related to the real estate market and time of repair and scope of repairs.

USG did not file a new trial motion. USG timely appeals from the judgment.

6

USG's central contention on appeal is that the trial court erred in awarding Irena consequential damages in the form of "carrying costs." USG asserts that as a matter of law, Irena was only entitled to an award of those costs it incurred to investigate and repair the damage caused by USG's product.[2] Specifically, USG argues that the award of "carry costs" was barred by the "Right to Repair Act," or the "economic loss rule." USG further asserts the award does not have any other basis in law. We address these arguments in turn.

## I.      Right to Repair Act and the Economic Loss Rule

In *Seely v. White Motor Co.* (1965) 63 Cal.2d 9, the California Supreme Court held that a plaintiff who did not suffer personal injuries could not recover economic damages against a defendant who negligently manufactured a product. (*Id.* at p. 18.) Thirty-five years later, in *Aas v. Superior Court* (2000) 24 Cal.4th 627, the court applied the rule of *Seely*, also known as the "economic loss rule," to a construction defect case. (*Id.* at p. 636.)

In *Aas*, a group of homeowners sued the developer, contractor and subcontractors who built their homes. (*Aas v. Superior Court*, *supra,* 24 Cal.4th at p. 632.) Although the homes did not comply with the applicable building code, the plaintiffs had not suffered any personal injuries or property damage. (*Id.* at pp. 633-634.) The plaintiffs sought to recover economic damages, including the cost of repairing their homes. However, the court held that under the economic loss rule, the plaintiffs could not recover economic damages that had not resulted in property damage or personal injury. (*Id.* at pp. 643, 647.)

The *Aas* Court observed that under California tort law, courts had applied the economic loss rule in construction defect cases to bar recovery of purely economic losses, i.e., those not accompanied by either property damage or physical injuries:

---

[2]      On appeal USG does not contest the finding of liability or the costs awarded to Irena to investigate and repair the damage to the Property.

"Speaking very generally, tort law provides a remedy for construction defects that cause property damage or personal injury. Focusing on the conduct of persons involved in the construction process, courts in this state have found such a remedy in the law of negligence. [Fn. omitted.] Viewing the home as a product, courts have also found a tort remedy in strict products liability [fn. omitted], even when the property damage consists of harm to a sound part of the home caused by another, defective part. [Fn. omitted.] For defective products and negligent services that have caused neither property damage nor personal injury, however, tort remedies have been uncertain. Any construction defect can diminish the value of a house. But the difference between price paid and value received, and deviations from standards of quality that have not resulted in property damage or personal injury, are primarily the domain of contract and warranty law or the law of fraud, rather than of negligence. In actions for negligence, a manufacturer's liability is limited to damages for physical injuries; no recovery is allowed for economic loss alone. [Citation.] This general principle, the so-called economic loss rule, is the primary obstacle to plaintiffs' claim." (*Aas v. Superior Court*, *supra*, 24 Cal.4th at pp. 635–636.)

In response to the holding in *Aas*, the California Legislature enacted Civil Code sections 895 et seq. (the Right to Repair Act or the "Act"). The Act establishes a set of building standards pertaining to new residential construction, and provides homeowners with a cause of action against, among others, builders and individual product manufacturers for violation of the standards.[3] Civil Code sections 895 et seq. apply to

---

[3] Civil Code section 896 provides in relevant part: "In any action seeking recovery of damages arising out of, or related to deficiencies in, the residential construction, design, specifications, surveying, planning, supervision, testing, or observation of construction, a builder, and to the extent set forth in Chapter 4 (commencing with Section 910), a general contractor, subcontractor, material supplier, individual product manufacturer, or design professional, shall, except as specifically set forth in this title, be liable for, and the claimant's claims or causes of action shall be limited to violation of, the following standards, except as specifically set forth in this title." (Civ. Code, § 896.)

Civil Code section 896 also provides a list of the standards pertaining to residential construction.

general contractors, subcontractors, material suppliers, individual product manufacturers and design professionals to the extent that those persons caused, in whole or in part, a violation of a particular standard as the result of a negligent act or omission or breach of contract. (See Civ. Code, § 936.) Under the Act "upon a showing of violation of an applicable standard, a homeowner may recover economic losses from a builder without having to show that the violation caused property damage or personal injury [citations]. In such an instance, the Act abrogates the economic loss rule, thus legislatively superseding *Aas*." (*Greystone Homes, Inc. v. Midtec, Inc.* (2008) 168 Cal.App.4th 1194, 1202, fn. omitted.)

Where the Act applies, the plaintiff's damages are limited to those listed in Civil Code section 944, which provides: "If a claim for damages is made under this title, the homeowner is only entitled to damages for the reasonable value of repairing any violation of the standards set forth in this title, the reasonable cost of repairing any damages caused by the repair efforts, the reasonable cost of repairing and rectifying any damages resulting from the failure of the home to meet the standards, the reasonable cost of removing and replacing any improper repair by the builder, reasonable relocation and storage expenses, lost business income if the home was used as a principal place of a business licensed to be operated from the home, reasonable investigative costs for each established violation, and all other costs or fees recoverable by contract or statute." (Civ. Code, § 944.)

This notwithstanding, the Act does not apply to claims based on strict liability. (See Civ. Code, § 936 ["However, the negligence standard …does not apply to any general contractor, subcontractor, material supplier, individual product manufacturer, or design professional with respect to claims for which strict liability would apply"].)

Here, USG asserts that the Right to Repair Act bars Irena's recovery because the "carry costs" are not among the types of damages that are recoverable under the Act. Irena asserts that the Right to Repair Act is not implicated because it applies only to new residential units, not to homes that have been remodeled such as the Property in this case.

We need not resolve these issues, however. In our view, the Right to Repair Act does not apply for another reason. Irena sought recovery based on a strict liability

9

product defect theory, and it was on that basis that the trial court found liability and awarded the damages at issue. Given that strict liability claims have been expressly excluded from the Act, the Right to Repair Act does not limit Irena's recovery.

Likewise although the economic loss rule ordinarily precludes recovery of economic losses in tort and in strict liability when the defective product damages only the product itself,[4] where, as here, the defective product damages other property, the economic loss rule does not apply. (See *Jimenez v. Superior Court* (2002) 29 Cal.4th 473, 484 [holding that the economic loss rule did not bar a homeowner's recovery in tort based on strict products liability for damage that a defective window caused to the other parts of the home in which it had been installed]; *Stearman v. Centex* (2000) 78 Cal.App.4th 611, 623 [holding that a defective product—a defective foundation— resulted in damages to the walls, ceilings and countertops throughout the home, recovery of strict liability damages is not barred by the economic loss rule].) Here USG's defective topping compound caused damage to property other than the compound itself. Because of the delamination problem cause by USG's defective topping compound, approximately 15,000 square feet of walls and ceilings area had to be repaired and repainted and the completion of construction and the resale of the home was delayed.

Accordingly, neither the Right to Repair Act nor the economic loss rule applies as a matter of law to bar Irena from its award of "carrying costs."

---

[4] See for example: *Zamora v. Shell Oil Co.* (1997) 55 Cal.App.4th 204, 208-211 [barring recovery for homeowners in negligence or strict liability for the cost of replacing water pipes known to be defective, but which had not yet leaked]; *Fieldstone v. Briggs Plumbing Products, Inc.* (1997) 54 Cal.App.4th 357, 363-367 [rejecting an award of damage based on strict liability for a general contractor who replaced defective sinks that rusted and chipped prematurely when no other property had been damaged]; *San Francisco Unified School Dist. v. W.R. Grace & Co.* (1995) 37 Cal.App.4th 1318, 1327-1330 [finding a public school district could not state a cause of action in negligence or strict liability based on the presence of asbestos products in its buildings when the products had not contaminated the buildings by releasing friable asbestos]; *Sacramento Regional Transit Dist. v. Grumman Flexible* (1984) 158 Cal.App.3d 289, 293-298 [holding a transportation district could not recover in negligence or strict liability for the cost of repairing defective bus parts that had not caused further damage].

## II.    Other Legal Basis of Recovery

USG asserts that even if the Right to Repair Act and the economic loss rule do bar Irena's recovery, the trial court had no other legal grounds upon which to award Irena "carry costs." USG argues that Irena's recovery was limited to the costs to investigate and repair the damage caused by its product or to the diminution in value of the property. We agree.

The starting point to determine the proper measure of damages is found in Civil Code section 3333, which provides compensation for damages proximately caused by the defendant's conduct. (Civ. Code, § 3333; *Raven's Cove Townhomes, Inc. v. Knuppe Development Co.* (1981) 114 Cal.App.3d 783,801.) Under Civil Code section 3333, there is no fixed rule for determining the measure of damages. The formula that is the most appropriate to compensate the injured party in the particular case will be adopted. (*Aas v. Superior Court, supra,* 24 Cal.4th 627, 651, fn. 15 [the general rule is not rigid]; *Mozzetti v. City of Brisbane* (1977) 67 Cal.App.3d 565, 576.) This notwithstanding, for construction defect claims pled in negligence, damages to real property are based on the lesser of the repair costs or the diminution in value, along with other items such as the value of the loss of use during the injury. (*Raven's Cove Townhomes, Inc. v. Knuppe Development Co., supra,* 114 Cal.App.3d at pp. 801-802; *Safeco Insurance Co. v. J&D Painting* (1993) 17 Cal.App.4th 1199, 1202.) "The practical effect of this rule is to limit damages to property to the fair market value of the property prior to the damage." (*Kelly v. CB & I Constuctors, Inc.* (2009) 179 Cal.App.4th 442, 450.) In strict liability claims for construction defects, damages are based on the costs of repair. (*Stearman v. Centex, supra,* 78 Cal.App.4th at p. 625, citing, *Raven's Cove Townhomes, Inc. v. Knuppe Development Co., supra,* 114 Cal.App.3d at pp. 801-802.)

Here the trial court awarded the "carrying costs" damages in *addition* to the costs of repair. In its statement of decision the trial court relied on dicta in *Mozzetti* to justify the award. *Mozzetti's* holding, however, does not support the trial court's conclusion.

In *Mozzetti,* the court of appeal remanded the negligence design and construction case for a retrial on the issue of damages because the jury had been improperly instructed

that plaintiff could be awarded the costs of repairs (including loss of rental income), *and* diminution in value. (*Mozzetti v. City of Brisbane, supra,* 67 Cal.App.3d at pp. 575-576.) In dicta the court acknowledge that the rule to determine the proper measure of damages is not inflexible and in so doing identified other measures of recoverable damages in a property damage/design defect cases as: "loss of use of the property; loss of profits and prospective profits; increased operating expenses pending repairs; present and prospective damages that are the natural, necessary or reasonable incident of the taking of property; cost of minimizing future damages." (*Id.* at p. 576.) This notwithstanding, in reaching its conclusion, the court in *Mozzetti* reaffirmed and applied the general rule-- damages to real property are limited to the lesser of the repair costs *or* the diminution in value. (*Id.* at pp. 575-577.) Thus, contrary to what the trial court here suggests, *Mozzetti* does not support an extension of the general rule of damages in this case.

The trial court here also cited other cases which support an award of costs of repair *and* other damages such as costs associated with the loss of use, loss of rents and loss of profits while the property was being repaired. Irena's "carrying costs," however, do not fit into any of these categories of damages awarded in other construction defect cases. They are not lost profits, loss of use damages, lost rents or relocation costs. In addition, the award of "carrying costs" in this case was not limited only to those operating expenses pending the repairs. Moreover, Irena did not argue the "carry costs" were like repair investigation fees which have been deemed to be included within the costs of repair. (See *Stearman v. Centex, supra,* 78 Cal.App.4th at pp. 624-625 [recognizing that expert fees incurred during the investigation of the damages are recoverable as a cost of repair].) Indeed, Irena's award of "carry costs" included expenses it incurred *after* the repairs were finished in October 2009 when Irena (rather than list the house for sale) undertook efforts to refinance their construction loan.[5]

---

[5]     Based on the record before this court it appears that the operating expenses incurred after the repairs were complete were not proximately caused by USG's defective product, but instead arose because of the Irena's chosen method of financing project and Irena's decision not to list the property for sale prior to July 2010. The evidence

Although case law interpreting Civil Code section 3333 directs that the court should apply a flexible approach to measure damages, the award of "carrying costs" here is beyond even the most flexible application of Civil Code section 3333. As a matter of law, Irena was entitled to a damage award reflecting the lesser of the cost of repair (and investigation) or diminution of value. Because the "carrying costs" as formulated and awarded in this case cannot be characterized as falling into any recognized type damages awarded for tortious injury to real property, the trial court erred in awarding Irena its "carrying costs" as consequential damages in addition to the costs of repair.

Although during the trial the parties presented evidence concerning the cost of repair and investigation, there was a dearth of evidence and argument presented on the diminution of value of the property. Accordingly, this matter must be remanded for further proceedings to determine appropriate amount of damages to award to Irena. On remand, parties should be permitted to present evidence and arguments on both the costs of repair (and investigation) and diminution of value, and thereafter the court should enter a damage award for Irena reflecting the lesser of either the cost of repair (and investigation) or diminution of value of the property.

### DISPOSITION

The judgment is reversed and this matter is remanded for further proceedings in accord with the views expressed in this opinion. Each party shall pay its own costs on appeal.

**WOODS, J.**

**We concur:**

**PERLUSS, P. J.**                              **ZELON, J.**

---

presented during the trial that Irena could not sell the property before the summer of 2010 was not only self-serving, it is legally insufficient.